Filed 4/25/22  P. v. Salinas CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

|  |  |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>PEDRO SALINAS,<br><br>Defendant and Appellant. | F079629<br><br>(Super. Ct. No. VCF353719)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Tulare County.  Gary L. Paden, Judge.

Audrey Rene Chavez, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra and Rob Bonta, Attorneys General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Daniel B. Bernstein and Darren K. Indermill, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

# INTRODUCTION

Between October 2008 and July 2017,[1] defendant Pedro Salinas sexually abused his girlfriend's young daughter and the daughter's cousin multiple times. A jury convicted defendant of multiple counts of lewd acts upon a child under 14 years of age (some committed by force), sodomy of a child under 14 years of age, forcible sodomy of a minor, and sexual penetration of a minor. The trial court sentenced defendant to a total term of 122 years to life in prison, including five separate terms of 15 years to life, pursuant to the "One Strike" law (Pen. Code, § 667.61).[2]

Defendant contends on appeal (1) the evidence was insufficient to prove that the victim was under 14 years of age at the time of the lewd act charged in count 5; (2) the evidence was insufficient to prove forcible sexual penetration of a child 14 years of age or older, as charged in count 12, because the act of penetration involved use of defendant's penis which is not a foreign object for purposes of the statute; (3) the trial court erred in not staying his sentence as to count 8 because it involved the same act of forcible sodomy as charged in count 9; and (4) the trial court erred in instructing the jury to commence deliberations anew after substituting an alternate juror and, therefore, deprived defendant of his Sixth Amendment right to a unanimous jury. The People concede that we must stay the sentence on count 8 and overturn the convictions on counts 5 and 12 but argue that we may modify count 12 to the lesser included offense of sexual battery. The People also argue the trial court's instructions were not in error and, if erroneous, did not prejudice defendant. We accept the People's concessions but modify count 12 to the lesser included offense of assault on a person under 18 years of age with intent to commit rape (§ 220, subd. (a)(2)). We remand for resentencing and otherwise affirm the judgment.

---

[1]    Subsequent references to dates are to dates in the year 2017, unless otherwise stated.

[2]    All further statutory references are to the Penal Code unless otherwise indicated.

# PROCEDURAL BACKGROUND

The District Attorney of Tulare County filed an information on April 10, 2018, charging defendant with forcible lewd acts upon a child under 14 years of age (§ 288, subd. (b)(1); counts 1–3), lewd acts upon a child under 14 years of age (§ 288, subd. (a); counts 4–8, 14–16),[3] aggravated sexual assault of a child under 14 years of age by forcible sodomy (§ 269, subd. (a)(3); count 9), forcible sodomy of a child 14 years of age or older (§ 286, subd. (c)(2)(C); counts 10, 11), and forcible sexual penetration of a child 14 years of age or older (§ 289, subd. (a)(1)(C); counts 12, 13).[4] As to counts 1 through 5, 7, 8, and 10 through 16, the information alleged that defendant committed the offenses against more than one victim within the meaning of the One Strike law. (§ 667.61, subds. (b), (e).) In addition, counts 1 through 5, 8, 14, and 15 each alleged that defendant had substantial sexual conduct with a child under 14 years of age. (§ 1203.066, subd. (a)(8).)

Defendant pled not guilty to the charges and denied all allegations in the information.

After a four-day trial, on June 12, 2019, the jury convicted defendant of counts 1 through 6 and 8 through 15[5] and acquitted him of counts 7 and 16.[6] The jury found true the multiple victim circumstances (§ 667.61, subds. (b), (e)) as to counts 2, 3, 14, and 15 and the allegations that defendant had substantial sexual conduct with a child under 14 years of age (§ 1203.066, subd. (a)(8)) as to counts 1 through 5, 8, 14, and 15.

---

[3]    Count 6 alleged an attempted lewd act upon a child under 14 years of age.

[4]    Counts 1 through 13 relate to victim G.S., counts 14 and 15 relate to victim M.C., and count 16 relates to victim I.C.

[5]    As to counts 1 and 3, the jury acquitted defendant of forcible lewd acts upon a child but convicted him of the lesser included offense of lewd acts upon a minor.

[6]    Count 7 charged defendant with committing lewd conduct upon a child by touching the victim's buttocks and count 16 charged defendant with committing lewd conduct upon a child by pulling at her pants.

On July 15, 2019, the court denied probation and sentenced defendant to consecutive terms of 15 years to life on each of counts 2, 3, 9, 14, and 15, for a total indeterminate term of 75 years to life. The trial court also sentenced defendant to a total consecutive determinate term of imprisonment of 47 years[7] and imposed a $350 restitution fine (former § 1202.4, subd. (b)), a stayed $350 parole revocation restitution fine (§ 1202.45, subd. (a)), $300 sex offender fine (§ 290.3), a $1,000 sexual offense restitution fine (§ 294, subd. (b)), a $560 court operations assessment (§ 1465.8), and a $420 criminal conviction assessment (Gov. Code, § 70373).[8]

Defendant timely appealed that same day.

## FACTS

### I. People's Evidence

#### A. Defendant Sexually Abused G.S., His Girlfriend's Daughter (counts 1–13)

G.S. was six or seven years old when her mother, Estella,[9] started dating defendant in May of 2008 or 2009.[10] Defendant moved in with Estella and G.S. shortly thereafter. After they had been together approximately one to two years, in 2010, defendant and Estella had a son, Brian. Estella was with defendant for eight or nine years, ending their relationship in July after she learned defendant sexually abused G.S.

When defendant first moved in with Estella and G.S., they lived with Estella's sister, Celia, and her two daughters, Yasbel and Jennifer. One or two years later (while

---

**7** The trial court sentenced defendant to six years on count 1 and consecutive one-third terms on counts 4, 5, 6, and 8 (two years, two years, one year, & two years, respectively), plus nine years on count 10, nine years on count 11, eight years on count 12, and eight years on count 13.

**8** The court ordered that victim restitution remain open. (Former § 1202.4, subd. (f).)

**9** We will refer to the victims and their family by first names and/or initials to preserve the privacy of G.S., M.C., and I.C. No disrespect is intended.

**10** G.S. testified that she was born 2001.

4.

Estella was pregnant with Brian), defendant, G.S., and Estella moved in with Estella's sister, Salustia, and Salustia's daughters, Livoria, M.C., and I.C.

G.S. described a time while living at Celia's house, before she was 14 years old, when defendant showed his penis to G.S., M.C., and I.C.[11] Defendant offered to let them touch it, but the girls hid behind curtains because they did not want to look. G.S. described another time, before she turned 14 years old, when she was sitting on the bed and defendant touched her. Defendant put his finger into her anus.[12] Her cousin, Yasbel, was home and almost saw it happen, but G.S. never told Yasbel.

G.S. would sometimes sleep with her mother, Estella, and defendant. One time, while Estella was pregnant, defendant reached over and grabbed G.S.'s buttocks over her pajamas. G.S. was in third grade when that happened.[13] Another time, G.S. was playing with a friend and defendant twirled her while holding her on his shoulder. G.S.'s friend later told G.S. that defendant had touched her buttocks while twirling her in the air.[14]

Later, while Estella was in the hospital giving birth, defendant touched G.S. again.[15] Defendant went into Estella's bedroom and pulled G.S.'s pants down despite her resistance. He then put his fingers into her vagina for approximately 20 minutes. G.S.

---

[11] On cross-examination, G.S. remembered that another cousin, Iris, was also present.

[12] During closing argument, the prosecutor argued this incident supported conviction on count 1, a forcible lewd act upon a child under 14 years of age in violation of section 288, subdivision (b)(1). The jury convicted defendant of the lesser included offense of a lewd act upon a child under 14 years of age. (§ 288, subd. (a).)

[13] During closing argument, the prosecutor argued this incident supported conviction on count 7, a lewd act upon a child under 14 years of age in violation of section 288, subdivision (a).

[14] The prosecutor argued this incident also supported conviction on count 7, a lewd act upon a child under 14 years of age in violation of section 288, subdivision (a) and reminded the jury to agree on which incident supported conviction.

[15] As Brian was born in 2010, this incident would have occurred when G.S. was approximately eight years old. During closing argument, the prosecutor argued this incident supported conviction on count 2, a forcible lewd act upon a child under 14 years of age in violation of section 288, subdivision (b)(1).

5.

said that defendant caused her pain and she noticed blood after the incident. Defendant threatened to do worse to G.S. if she told anyone what he had done, and she became afraid that he would rape her.

G.S. testified about another incident where defendant had touched her vagina while in a vehicle in a store parking lot.[16] She had accompanied defendant to purchase dog food, but when they reached the parking lot, defendant reached back to where she was sitting and put his fingers into her vagina. Although G.S. cried and attempted to avoid him, defendant was able to insert his fingers. G.S. bled onto her underwear and defendant threw them away when they arrived home so Estella would not see. This incident occurred before G.S. turned 14 years old.

G.S. described that her mother would leave to work in the fields at 5:00 a.m. or 6:00 a.m. most mornings, leaving G.S. with defendant and her brother Brian. While Brian was sleeping, defendant would wake G.S., take her to his bedroom, and sexually assault her before he left for work. Until G.S. reported the abuse to the police on July 19, defendant sexually abused her approximately five to six times per week, mostly when her mother was at work, at the store, helping family members, or doing laundry in a detached part of the residence.

Estella testified that during her relationship with defendant, she worked in the fields, stopping only for the birth of their son, Brian. Estella also testified that she left for work every morning, approximately five or six days a week, between 5:00 a.m. and 6:00 a.m. (or 4:30 a.m.–5:30 a.m., depending on the time of year), leaving G.S. and Brian home with defendant until he left for work. Defendant worked for an irrigation company and would leave for work after Estella, sometimes as early as 6:00 a.m.

---

**16**     During closing argument, the prosecutor argued this incident supported conviction on count 3, a forcible lewd act upon a child under 14 years of age violation of section 288, subdivision (b)(1).

G.S. testified that defendant threatened her several times during the years of sexual abuse and said that he would hurt her if she ever told anyone of the abuse. She was afraid of defendant because defendant continually threatened and forced her to comply with the abuse.

One time, before G.S. was 14 years old, defendant ordered G.S. into the bedroom for sexual abuse, and G.S. refused to go. Her mother was sleeping by the couch, so G.S. laid down near her. Defendant brought a knife from the kitchen and told G.S. to go to defendant's bedroom while using the knife to cut his fingernails. G.S. interpreted the action as a threat to compel her to obey. G.S. woke Estella, Estella asked defendant why he had the knife, and defendant claimed he was using it to cut his nails. Estella remembered waking up and seeing defendant with a knife but testified that he often cleaned his nails with a knife.

G.S. testified that when she was in third or fourth grade, she told Estella defendant had been touching her. According to G.S., Estella discussed it with defendant that evening and, the next day, defendant punished G.S. by putting his fingers into her vagina. Estella testified that G.S. did not tell her defendant had been sexually abusing her.

G.S. testified that between the time that defendant first sexually abused her and the day that she reported the abuse to the police, defendant tried to force his penis into her vagina several times.[17] He would touch his penis to her vagina, and it would not go all the way inside. G.S. initially testified that this happened more than five times but clarified she could not remember the specific days, just that it happened more than once before she turned 14 years old.

---

**17** During closing argument, the prosecutor argued this incident supported conviction on count 6, an attempted lewd act upon a child under 14 years of age (§ 288, subd. (a)).

In addition to the other acts of sexual abuse, defendant also put his mouth on G.S.'s vagina at least 50 times and at least one time before she turned 14 years old.[18] Defendant also made G.S. put her mouth on his penis approximately 10 times, but she did not remember if any of those incidents occurred before she turned 14 years old.[19]

G.S. testified that defendant put his finger into her anus approximately 30 times over the years, and more than three of those incidents occurred before she was 14 years old. Defendant put his penis into her anus approximately 10 to 15 times in that period but only once before she turned 14 years old.[20] Defendant would use lubricant or saliva on his finger before inserting it into her anus, and usually inserted his finger first before inserting his penis.

As G.S. got older, defendant would put his penis into her anus with increasing frequency. Defendant did this to her both in his bedroom and in the living room. During one incident, in the living room, defendant bent her over the couch, with her feet on the floor and her upper body on the cushions. While defendant put his penis into her anus, she cried and screamed into the cushion because of the pain.[21]

---

[18] During closing argument, the prosecutor explained that this conduct was the basis of count 4, a lewd act upon a child under 14 years of age (§ 288, subd. (a)).

[19] During closing argument, the prosecutor explained that this conduct was the basis of count 5, a lewd act upon a child under 14 years of age (§ 288, subd. (a)).

[20] During closing argument, the prosecutor explained that this conduct was the basis of count 8, a lewd act upon a child under 14 years of age (§ 288, subd. (a)).

[21] During closing argument, the prosecutor explained that this conduct was the basis of count 9, aggravated sexual assault of a child under 14 years of age by forcible sodomy (§ 269, subd. (a)(3)). The prosecutor explained that counts 10 and 11, forcible sodomy, related to the first time and last time defendant put his penis in G.S.'s anus when she was 14 years of age or older (§ 286, subd. (c)(2)(C)).

G.S. revealed defendant's sexual abuse on July 19.  G.S. testified that the day before reporting the sexual abuse, on July 18,[22] defendant told G.S. that he would be gradually inserting his penis into her vagina to expand her vagina so that by the time she turned 18 years old, he would be able to fully insert his penis.  Defendant inserted his penis into her vagina, but it did not go all the way inside.[23]  Defendant also put his finger into G.S.'s anus before he inserted his penis.  He rubbed his penis between her legs until sperm came out.[24]  G.S. used toilet paper to wipe the sperm from her body.  G.S. showered the next day.

On July 19, G.S. told the police that earlier that day defendant had sexually abused her by putting his penis into her anus and was interrupted by the arrival of his coworker.[25]  G.S. did not recall anyone else arriving at the residence that morning.

**B.**      Discovery of Defendant's Sexual Abuse of G.S., M.C., and I.C.

On July 18, I.C. and M.C. told their cousin, Daisy, that defendant had sexually abused them.  The following day, G.S.'s cousin (either M.C. or I.C.) texted G.S. and invited her to M.C.'s house.  G.S.'s other cousins, Daisy and Iris, picked G.S. up to take her to M.C.'s house.  During the car ride, Daisy asked G.S. if defendant ever touched her.  G.S. denied it because she did not "want to say it."  Daisy asked again and told G.S. that M.C. and I.C. had told Daisy that defendant touched them.  G.S. broke down crying and admitted that defendant had been sexually abusing her.  Upon arriving at M.C.'s house,

---

[22]      G.S. testified to sexual assaults by defendant on both July 18 and 19.  During direct testimony, she described that defendant had put his penis in her anus and ejaculated on July 19, the same day the abuse was reported to the police.  Defense counsel elicited that those events occurred the day before, on July 18.

[23]      In closing argument, the prosecutor explained to the jury that this incident was charged in count 12, forcible sexual penetration of a child 14 years of age or older (§ 289, subd. (a)(1)).

[24]      In closing argument, the prosecutor explained that this incident was charged in count 11, forcible sodomy upon a child 14 years of age or older (§ 286, subd. (c)(2)(C)).

[25]      In closing argument, the prosecutor explained that this incident was charged in count 13, forcible sexual penetration of a child 14 years of age or older. (§ 289, subd. (a)(1)).

Salustia (Estella's sister and the mother of M.C. and I.C.) called the police and reported what defendant had done.

Estella testified that she learned about the allegations against defendant from Celia when G.S. did not return from M.C.'s house. When she called defendant, he denied the allegations. Estella then called the police and, while the police were with her, she called defendant again. Defendant continued to deny the allegations. Estella asked defendant to return to their residence, but defendant refused. He told Estella that he was not stupid and would not go to jail. Defendant sounded as if he had been drinking, although he had not had a drink for more than a year before that day. Defendant claimed that whatever was being said was not true. Defendant demanded to speak to G.S. and became upset when Estella refused.

After speaking with the police, G.S. submitted to a sexual assault examination that included swabbing the inside and outside of her anus and vagina. G.S. testified that she did not sit on any furniture while unclothed, rub defendant's clothing on her genitals, or rub any other item with his DNA on her genitals. The family shared a single bathroom. G.S. further testified that she had told the truth to the police, no one told her what to say, and that her testimony was truthful.

Angela Yarbrough, a nurse, testified that G.S.'s sexual assault examination involved a visual inspection of her external genitalia, vaginal area, perineum, and rectal area. Because of the invasiveness of the exams, G.S. refused to allow a speculum exam or anus scope exam. G.S. advised Yarbrough that G.S. had showered earlier that day. The examination resulted in no physical findings, which is not uncommon, though there were some abnormal secretions coming out of her vagina. The findings were consistent with the history given by G.S.

Yarbrough obtained a vaginal swab, rectal swab, and an external genitalia swab and submitted them for DNA analysis. Adrian Mendoza, a senior criminalist with the Department of Justice at the Fresno Regional Laboratory, testified that he extracted DNA

from the swabs and separated the DNA extractions into a "sperm fraction" and a "non-sperm fraction."

According to Mendoza, the vaginal swab tested negative for both sperm and p30, a protein found in seminal fluid. The rectal swab and external genitalia swab both tested negative for sperm but positive for p30. A mixture of DNA was found for the sperm fraction of the external genitalia swab, consistent with G.S. as a major contributor and a minor male contributor, although it could not be determined whether the male DNA was from semen, blood, or skin cells. Defendant could not be eliminated as the male contributor. However, the minor contributor types are expected to occur in randomly selected individuals of one in approximately 96 quadrillion African Americans, 18 quadrillion Caucasians, and 91 quadrillion Hispanics.

Mendoza could not opine as to when defendant's DNA was transferred to G.S. or how it was transferred. Mendoza acknowledged that individuals sharing a residence would have contact with the DNA of other occupants and transfer could take place. If such a transfer happened, the number of cells transferred would be small. Upon questioning by the defense, Mendoza testified that male ejaculate could remain detectable up to five days, depending upon the environment and whether the victim had a bowel movement, wiped the area, or showered after the transfer.

**C.** Defendant Sexually Abused G.S.'s Cousin, M.C. (counts 14 & 15)

M.C., 16 years old at the time of trial, testified her aunt Estella, G.S., and defendant lived with her family when she was six years old. Estella and defendant's son, Brian, had not yet been born when they moved into the house. One day, G.S. and M.C. arrived home from school and only defendant was present. At some point, M.C. went into G.S.'s room looking for her. G.S. shared the room with defendant and Estella. G.S. was not there, having used the sliding glass door to go outside. However, defendant was

11.

in the room. He took down M.C.'s pants, put his fingers inside her vagina, and moved them around. She never told anyone.

M.C. also described when defendant touched her vagina a second time, several months later. M.C. and her sister, I.C., accompanied Estella, defendant, and G.S. to a lake where they went swimming. M.C. thought that Brian might have been there, but she was not sure. Defendant joined her in the water and again put his fingers into her vagina. M.C. did not tell anyone. M.C. testified that "at the time [Estella, G.S., defendant, and Brian] moved out of [her] house" and she "just stopped going to their house after that. [She] wouldn't go there."

When M.C. was 14 years old, in July, she told the police about these incidents. She had spoken of them to her older cousin, Daisy, who then told M.C.'s sister, Livoria, and Livoria contacted the police the following day. Daisy believed that if defendant had touched M.C., he most likely also touched G.S., and Daisy arranged to talk to G.S. However, M.C. did not discuss the incidents with G.S.

**D.** Testimony of G.S.'s Cousin I.C. (count 16)

M.C.'s sister, I.C., was approximately seven years old when she first felt uncomfortable around defendant because of the way he stared at her. When she was 9 or 10 years old, she stayed at G.S.'s house and defendant tried to touch her.[26] I.C. was entering the bathroom when defendant prevented her from closing the door. She left the bathroom and defendant followed her into the kitchen where he attempted to pull down her pants. She held onto her pants and defendant grabbed her hands so he could pull them down. Defendant promised I.C. that if she let him pull down her pants, he would buy her whatever she wanted. I.C. was able to get away from defendant.

---

[26] I.C. testified that she stayed at G.S.'s house for one week. Estella and G.S. testified that they did not remember I.C. ever staying at their house for that length of time.

12.

I.C. told her parents that she did not want to return to G.S.'s house but did not tell them the reason. I.C. did not tell anyone about the incident until she was 13 years old when she told her cousin, Daisy, and the next day, the police. I.C. did not discuss this incident with M.C., and while I.C. knew M.C. never wanted to go to G.S.'s house, she did not know the reason.

## II. Defense Evidence

Lola Yarbrough[27] worked as a public health nurse, and in July, defendant was her patient. As part of her duties, Lola would take medication to defendant and watch him take it. Lola arrived at defendant's residence Mondays through Thursdays, at approximately 6:45 a.m. (before he left for work at 7:00 a.m.) and would leave after 5 or 10 minutes. During the visits, she stayed just inside the residence by the front door. She last visited defendant on July 18 and 19.

## DISCUSSION

## I. Sufficiency of the Evidence as to counts 5 and 12

### A. Lewd Act Upon a Child Under 14 Years of Age (count 5)

Defendant argues that the evidence is insufficient to support his conviction on count 5 because the prosecution failed to present evidence that G.S. was under 14 years of age at the time. The People agree. We have reviewed the record and accept this concession.

#### 1. Background

Defendant was charged in count 5 with committing a lewd act upon a child under 14 years of age, "to wit, mouth to penis," in violation of section 288, subdivision (a). (Capitalization omitted.) During closing argument, the prosecutor explained to the jury that count 5 applied to G.S.'s testimony that defendant forced G.S. to put her mouth on

---

**27** Because another witness has the same surname, we refer to Lola Yarbrough by her first name. No disrespect is intended.

his penis approximately 10 times. During this testimony, the prosecutor asked G.S., "And was at least one of those times before you turned 14 years old?" G.S. replied, "I don't remember." The record contains no additional testimony regarding G.S.'s age when the act charged in count 5 occurred.

### 2. *Applicable Law and Standard of Review*

In reviewing the sufficiency of evidence to support a conviction, we examine the entire record and draw all reasonable inferences therefrom in favor of the judgment to determine whether it discloses substantial credible evidence from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*People v. Brooks* (2017) 3 Cal.5th 1, 57.) We do not redetermine the weight of the evidence or the credibility of witnesses. (*People v. Albillar* (2010) 51 Cal.4th 47, 60; *People v. Young* (2005) 34 Cal.4th 1149, 1181 ["Resolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact."].) We must accept logical inferences that the trier of fact might have drawn from the evidence although we would have concluded otherwise. (*People v. Streeter* (2012) 54 Cal.4th 205, 241, overruled on other grounds as stated in *People v. Harris* (2013) 57 Cal.4th 804, 834.) "If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding." (*Albillar*, at p. 60.) "Moreover, unless the testimony is physically impossible or inherently improbable, testimony of a single witness is sufficient to support a conviction." (*Young*, at p. 1181.)

To prove that defendant is guilty of committing a lewd or lascivious act upon a child under 14 years of age, in violation of section 288, subdivision (a), the People were required to prove that: (1) defendant willfully touched any part of a child's body either on the bare skin or through the clothing; (2) defendant committed the act with the intent of arousing, appealing to, or gratifying the lust, passions, or sexual desires of himself or

the child; and (3) the child was under 14 years of age at the time of the act. (CALCRIM No. 1110.)

### 3. Analysis

In this case, the only evidence regarding G.S.'s age at the time defendant made her place her mouth on his penis was her testimony that she could not recall whether this happened before she turned 14 years old. As the evidence is insufficient to prove beyond a reasonable doubt that the crime occurred before G.S. was 14 years old, we agree that we must reverse the conviction. (*People v. Mejia* (2007) 155 Cal.App.4th 86, 97.)

### B. Sexual Penetration (count 12)

Defendant argues that the prosecution's evidence that he penetrated G.S. with his penis is insufficient to support his conviction on count 12, forcible sexual penetration of a child 14 years of age or older with a foreign object (§ 289, subd. (a)(1)(C)), because a penis cannot be a foreign object (except under circumstances not applicable here). The People agree. We have reviewed the record and accept this concession.

The People argue, however, that we may find defendant guilty of sexual battery (§ 243.4, subd. (a)) as a lesser included offense. Defendant argues that sexual battery requires contact with the victim's skin, an element not necessarily found by the jury's verdict of guilt as to sexual penetration, and that section 243.4, subdivision (g) defines sexual battery in such a way as to exclude acts defined as rape (§ 261) and sexual penetration (§ 289). We do not decide whether forcible sexual battery is a lesser included offense of sexual penetration when the charging instrument identifies the foreign object as a penis because we unquestionably find that assault of a person under 18 years of age with intent to commit rape (§ 220) is a lesser included offense in these circumstances. We conclude that application of the accusatory pleading test permits us to exercise our discretion to reduce defendant's conviction on count 12 to assault of a person under 18

15.

years of age with intent to commit rape (§ 220, subd. (a)(2)) and will remand for resentencing.

*1.     Background*

Count 12 of the information charged defendant with the following:

"On or about and between October 5, 2015 and July 20, 2017, in the County of Tulare, the crime of SEXUAL PENETRATION BY FOREIGN OBJECT-MINOR VICTIM OVER 14, TO WIT, PENIS TO VAGINA, in violation of PENAL CODE SECTION 289A1C, a FELONY, was committed by **PEDRO SALINAS**, who unlawfully committed an act of sexual penetration against the will of G.S. who was a minor over the age of 14 years, by means of force, violence, duress, menace and fear of immediate and unlawful bodily injury on G.S. and another person."

During closing argument, the prosecutor explained to the jury that count 12 applied to G.S.'s testimony that defendant forced his penis part way into G.S.'s vagina on July 18, the day before defendant's conduct was reported to the police.

G.S. testified that the day before reporting the sexual abuse, defendant told G.S. his plan to gradually insert his penis into her vagina to expand her vagina so that by the time she turned 18 years old, he would be able to fully insert his penis. Defendant then inserted his penis into her vagina, although it did not go all the way inside.[28] Defendant also put his finger into G.S.'s anus before he inserted his penis. He then rubbed his penis between her legs until sperm came out.

*2.     Applicable Law and Standard of Review*

a.     Standard of Review

We set forth the applicable law and standard of review for challenges to the sufficiency of the evidence in part I.A.2. of the Discussion. (*Ante*, at p. 14.)

---

[28]     Although this act would have provided sufficient evidence of sexual penetration, it was not the act alleged in count 12 and was not mentioned during the prosecutor's closing argument.

16.

### b.    Sexual Penetration

To prove that defendant is guilty of committing sexual penetration by force, in violation of section 289, subdivision (a)(1)(C), the People were required to prove that: (1) defendant committed an act of sexual penetration with another person; (2) the penetration was accomplished by using a foreign object, or substance, instrument, device, or unknown object; (3) the other person did not consent to the act; and (4) defendant accomplished the act by force, violence, duress, menace, or fear of immediate and unlawful bodily injury to another person.  (CALCRIM No. 1045.)  Section 289 defines a foreign object, substance, instrument, or device as including any part of the body *except* a sexual organ.  (§ 289, subd. (k)(2).)  A penis can be an unknown object only if it is not known what object actually penetrated the opening.  (*Id*., subd. (k)(3); CALCRIM No. 1045.)

### c.    Modification of Verdict

"We have 'long recognized that under Penal Code sections 1181, subdivision (6), and 1260, an appellate court that finds that insufficient evidence supports the conviction for a greater offense may, in lieu of granting a new trial, modify the judgment of conviction to reflect a conviction for a lesser included offense.' [Citations.]  We have applied two tests in determining whether an uncharged offense is necessarily included within a charged offense:  the 'elements' test and the 'accusatory pleading' test. [Citation.]  The elements test is satisfied if the statutory elements of the greater offense include all of the statutory elements of the lesser offense, such that all legal elements of the lesser offense are also elements of the greater."  (*People v. Bailey* (2012) 54 Cal.4th 740, 748, fn. omitted (*Bailey*).)  "Under the accusatory pleading test, a lesser offense is included within the greater charged offense if the facts actually alleged in the accusatory pleading include all of the elements of the lesser offense."  (*Ibid*.)  " 'Courts should consider the statutory elements and accusatory pleading in deciding whether a defendant

17.

received notice, and therefore may be convicted, of an *uncharged* crime ….' " (*Id*. at p. 751.)

Our authority to reduce a conviction to a lesser included offense is based on section 1181, subdivision (6), which states that "if the evidence shows the defendant to be not guilty of the degree of the crime of which he was convicted, but guilty of a lesser degree thereof, or of a lesser crime included therein, the court may modify the verdict, finding or judgment accordingly without granting or ordering a new trial .…" (§ 1181, subd. (6).) Similarly, section 1260, states that "[t]he court may … reduce the degree of the offense … or the punishment imposed, and may set aside, affirm, or modify any or all of the proceedings subsequent to, or dependent upon, such judgment or order, and … may, if proper, remand the cause to the trial court for such further proceedings as may be just under the circumstances." (§ 1260; see *People v. Navarro* (2007) 40 Cal.4th 668, 671 (*Navarro*).) The statute's use of the word "may" indicates that a court's authority to modify a judgment of conviction to reflect a lesser included offense is permissive, not mandatory. (*People v. Hamilton* (2018) 30 Cal.App.5th 673, 685; see *People v. Hill* (1953) 116 Cal.App.2d 212, 216 ["the statute is merely permissive"].)

To modify a judgment under sections 1181, subdivision (6), and 1260, we must "decide whether the jury, in finding defendant guilty … necessarily found all of the elements of [the lesser included offense]. In modifying a judgment under sections 1181, subdivision (6), and 1260, an appellate court 'merely brings the jury's verdict in line with the evidence presented at trial' [Citation.] In other words, an appellate court may make a modification, ' "not by finding or changing any fact, but by applying the established law to the existing facts as found by the jury." ' " (*Bailey*, *supra*, 54 Cal.4th at p. 752.)

### 3. Analysis

Section 289, subdivision (a) was enacted in 1978 to correct a deficiency in existing law as forcible rape, oral copulation, and sodomy were subject to fairly severe penalties

but did not include the forcible insertion of objects into a victim's vagina or anus, which was punishable only as a battery under section 242. (*People v. Kusumoto* (1985) 169 Cal.App.3d 487, 491, disapproved on other grounds as recognized in *People v. McCann* (2019) 41 Cal.App.5th 149, 157.) "According to a report prepared for the Senate Committee on Judiciary, section 289[, subdivision ](a) was intended to correct the discrepancy by making the punishment for forcible rape-by-object the same as that for rape. In 1980, Assembly Bill No. 3420 was passed in order to increase the penalties for object rape to correspond to those for all other forcible sexual assaults. (Stats. 1980, ch. 409, § 1, p. 798.)" (*Kusumoto*, at p. 491.) Therefore, section 289, subdivision (k)(2) excludes a sexual organ from the definition of a foreign object because other statutes address crimes committed by using a sexual organ.

In this case, the information charged defendant with using his penis to penetrate G.S.'s vagina against her will by means of force, violence, duress, menace, and fear. However, penetration of a vagina with a penis is "sexual intercourse," and an act of sexual intercourse against a person's will by force is rape in violation of section 261, subdivision (b). (*People v. Holt* (1997) 15 Cal.4th 619, 676 [" '[A]ny penetration of the male sex organ into the female sex organ, however, slight, constitutes an engaging in an act of sexual intercourse' "]; CALCRIM No. 1000.) Despite citation to section 289, the charging language of count 12 was sufficient to charge a violation of rape pursuant to section 261, subdivision (a). (*People v. Thomas* (1987) 43 Cal.3d 818, 826 [recognizing that valid accusatory pleading does not require a specific statutory enumeration, that specific allegations of accusatory pleading constitute measuring unit for determining what offenses are included in a charge, and that even a reference to the wrong statute has been viewed of no consequence]; *People v. Eppinger* (1894) 105 Cal. 36, 38–39 [information describing crime as forgery (§ 470) immaterial in light of specific acts alleged describe crime under fictitious check statute (§ 476)].)

19.

Had the prosecutor requested the jury be instructed on the elements of rape, we are confident that under the facts of this case, the jury's verdict on count 12 would have not changed. However, the prosecutor proceeded to conviction, arguing facts that legally could not support a violation of section 289. Neither section 1181 nor section 1260 permit us to substitute the crime of rape for that of sexual penetration because the jury was not instructed as to rape or asked to render a verdict as to rape. We may, however, decide whether the jury, in finding defendant guilty of sexual penetration, necessarily found all of the elements of a lesser included offense.

a.     Sexual Battery as a Lesser Included Offense

The People argue that forcible sexual battery (§ 243.4, subd. (a)) is a lesser included offense of count 12 under the accusatory language test, relying upon *People v. Ortega* (2015) 240 Cal.App.4th 956, 967–971 (*Ortega*). Section 243.4, subdivision (a) proscribes the touching of an intimate part of another person while that person is unlawfully restrained, and if the touching is against the will of the person touched and is for the purpose of sexual arousal, sexual gratification, or sexual abuse. In *Ortega*, the defendant argued that sexual battery was a lesser included offense of forcible sexual penetration under the statutory elements test because forcible sexual penetration could not be committed without also committing sexual battery. *Ortega* agreed that penetration by " 'force, violence, duress, menace, or fear of immediate and unlawful bodily injury' " as required by section 289 could not occur without the victim also being unlawfully restrained as required by section 243.4. (*Ortega*, at p. 966.) *Ortega* similarly agreed that " 'sexual,' as used in the phrase 'sexual arousal, gratification, or abuse' in section 289, subdivision (k) (defining 'sexual penetration')" had the same meaning as the " 'sexual arousal, sexual gratification, or sexual abuse' element of sexual battery." (*Ibid.*) However, sexual battery was not a lesser included offense under the elements test because "physical contact" required that the offender's body contact the victim's skin

either directly or through the offender's clothing (§ 243.4, subd. (f)) while sexual penetration included penetration by any foreign object, substance, instrument, or device, or by any unknown object (§ 289, subd. (k)(1)). Thus, sexual penetration could be committed without committing sexual battery where the perpetrator accomplished it by use of something other than a body part.

Having found sexual battery was not a lesser included offense of sexual penetration under the elements text, *Ortega* next applied the accusatory pleading test of *People v. Marshall* (1957) 48 Cal.2d 394 (*Marshall*). (*Ortega*, *supra*, 240 Cal.App.4th at p. 967.) *Marshall* concluded that the specifically charged allegations contained in the accusatory pleading, rather than the statutory definition of the charged offense, constituted the measuring unit for determining what offenses are necessarily included in the charge. (*Marshall*, at p. 405.) In *Marshall*, the information alleged that the defendant committed robbery (§ 211) by willfully, unlawfully, feloniously, and forcibly taking an automobile from the immediate presence of another person. (*Marshall*, at p. 396.) After a bench trial, the court found the defendant guilty of taking another's vehicle without consent, under former Vehicle Code section 503. (*Marshall*, at p. 396.) The defendant argued that the statutory definition of robbery did not necessarily include offenses prohibited under former Vehicle Code section 503. (*Marshall*, at p. 396.) In concluding that the lesser included offense inquiry was determined by the specific allegations in the accusatory pleading, as opposed to the statutory elements of robbery, the court stressed that the defendant was put on notice by the information that he should be prepared to defend against a showing that he took the automobile. (*Id*. at p. 405.)

*Ortega* similarly concluded that if the information had identified the defendant's finger as the means of penetration in the same way the information in *Marshall* identified the automobile as the victim's property, the information would have contained the elements of a felony sexual battery, and sexual battery instructions would have been required as a lesser included offense. (*Ortega*, *supra*, 240 Cal.App.4th at pp. 966–968.)

21.

In *Ortega*, however, the information did not allege the means the defendant used to violate the statute. In finding that sexual battery was a lesser included offense using the accusatory pleading test, *Ortega* expanded its analysis to include the evidence adduced at the preliminary hearing.[29]  (*Id*. at p. 969.)

Defendant makes additional arguments against sexual battery being considered a lesser included offense of sexual penetration not addressed by *Ortega*:  (1) sexual battery requires contact with the victim's skin, an element not alleged in count 12 nor necessarily found by the jury's verdict of guilt as to sexual penetration; and (2) section 243.4, subdivision (g)(2) defines sexual battery to exclude the crimes defined in sections 261 (rape) and 289 (sexual penetration).

Addressing defendant's first argument, count 12 alleged that defendant penetrated G.S.'s vagina using his penis, and we conclude that this allegation is sufficient to allege defendant touched G.S.'s bare skin. Defendant also argues that the jury's verdict as to count 12 was not required to find that defendant penetrated G.S.'s vagina without any clothing or barrier to her skin. However, as to the act alleged in count 12, G.S. testified that the day before reporting the sexual abuse, defendant inserted his penis into her vagina and rubbed his penis between her legs until sperm came out. That G.S. was unclothed at the time of defendant touched her is evidenced by G.S.'s testimony that she used toilet paper to wipe the sperm from her body. In addition, G.S. and Yarbrough both testified that G.S. participated in an examination from which Yarbrough obtained swabs

---

**29**      Both parties recognize that *Ortega* has been criticized for expanding the accusatory pleading test to look beyond the language of the information and permit consideration of preliminary hearing testimony. (*People v. Alvarez* (2019) 32 Cal.App.5th 781, 787–790; *People v. Munoz* (2019) 31 Cal.App.5th 143, 157–158; *People v. Macias* (2018) 26 Cal.App.5th 957, 964 ["We decline to adopt *Ortega*'s 'expanded accusatory pleading test' because it is contrary to [*People v.*]*Montoya* [(2004) 33 Cal.4th 1031].  As explained by the Supreme Court in *Montoya*:  'Consistent with the primary function of the accusatory pleading test—to determine whether a defendant is entitled to instruction on a lesser uncharged offense—we consider *only* the pleading for the greater offense.' "].)

of G.S.'s vagina, rectal area, and external genitalia. The rectal and external genitalia swab tested positive for p30, a protein found in seminal fluid, again evidencing that G.S.'s bare skin was touched by defendant during the sexual abuse.

Defendant's second argument, that crimes defined in sections 261 and 289 are excluded from the definition of sexual battery is less straightforward. (See § 243.4.) We could find no case explaining the effect of this statute. Regarding the instant case, defendant's sexual abuse of G.S., as we have concluded, is not the crime of sexual penetration in violation of section 289 because it was not committed using a foreign object. However, count 12 alleges that defendant forcibly penetrated G.S.'s vagina, some of the elements of rape. Given that defendant has not been convicted of rape, section 243.4, subdivision (g)(2) does not necessarily preclude us from modifying defendant's conviction of count 12 to the lesser included offense of sexual battery in violation of section 243.4, subdivision (a). However, we decline to do so in light of our conclusion that assault of a person under 18 years of age with intent to commit rape (§ 220, subd. (a)(2)) is a lesser included offense of count 12 as discussed below. (*Navarro*, *supra*, 40 Cal.4th at p. 681 ["However, it seems logical that, where there are multiple lesser included offenses supported by the evidence at trial, a court exercising its discretion to modify the judgment pursuant to these provisions should choose the offense with the longest prescribed prison term so as to effectuate the fact finder's apparent intent to convict the defendant of the most serious offense possible."].)

b.      Assault with Intent to Commit Rape as a Lesser Included Offense

We asked the parties for supplemental briefing as to whether assault of a person under 18 years of age with intent to commit rape (§ 220, subd. (a)(2)) is a lesser included offense of count 12 in light of its language alleging that defendant forcibly penetrated G.S.'s vagina against her will while she was a minor over the age of 14 years. Both parties argue that we may not reduce the charge because the information failed to allege

that G.S. was not defendant's spouse. However, as we discuss below, assault with intent to commit rape includes both spousal and nonspousal rape, and the victim's status is not required to be alleged in the information. We conclude that application of the accusatory pleading test permits us to exercise our discretion to reduce defendant's conviction on count 12 to assault of a person under 18 years of age with intent to commit rape (§ 220, subd. (a)(2)), and we will remand for resentencing.

*Marshall* concluded that the specifically charged allegations contained in the accusatory pleading, rather than the statutory definition of the charged offense, constituted the measuring unit for determining what offenses are necessarily included in the charge. (*Marshall*, *supra*, 48 Cal.2d 394 at p. 405.) Under the accusatory pleading test, we determine whether the perpetrator can commit the greater included offense without necessarily committing the lesser included offense as a matter of fact in view of the allegations. (*People v. Sanchez* (2001) 24 Cal.4th 983, 995, disapproved on other grounds in *People v. Reed* (2006) 38 Cal.4th 1224, 1228–1229.)

Section 220, subdivision (a)(2) provides: "Except as provided in [section 220, ]subdivision (b), any person who assaults another person under 18 years of age with the intent to commit rape, sodomy, oral copulation, or any violation of Section 264.1, 288, or 289 shall be punished by imprisonment in the state prison for five, seven, or nine years." (§ 220, subd. (a)(2).) "Section 240—unchanged since its initial enactment in 1872—defines assault as 'an unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another.' " (*People v. Williams* (2001) 26 Cal.4th 779, 784.) Despite use of the term "violent injury," assault only requires an intentional act and actual knowledge of those facts sufficient to establish that the act by its nature will probably and directly result in the application of physical force against another. (*Id*. at p. 790.) Our Supreme Court has also described it as an "act that by its nature will probably and directly result in injury to another, i.e., a battery.… The evidence must only demonstrate that the defendant willfully or purposefully attempted a

'violent injury' or 'the least touching,' i.e., 'any wrongful act committed by means of physical force against the person of another.' " (*People v. Colantuono* (1994) 7 Cal.4th 206, 214.) " '[A]ny harmful or offensive touching constitutes an unlawful use of force or violence' " and thus is a battery. (*People v. Pinholster* (1992) 1 Cal.4th 865, 961, disapproved on other grounds *People v. Williams* (2010) 49 Cal.4th 405, 459; see *People v. Bradbury* (1907) 151 Cal. 675, 676–677 [for assault with intent to commit rape, " ' "[t]he kind of physical force is immaterial" ' " and may " ' "consist in the taking of indecent liberties with a woman, or laying hold of and kissing her against her will" ' "].)

Our Supreme Court has recognized that assault with intent to commit rape is a lesser included offense of rape. (*People v. Chavez* (1894) 103 Cal. 407, 407–408 ["it may be conceded that an assault with intent to commit rape, as well as a simple assault, are included [in rape]"]; see *People v. Ramirez* (1969) 2 Cal.App.3d 345, 353; *In re Jose M.* (1994) 21 Cal.App.4th 1470, 1477 ["[o]ne charged with rape by force or violence may be found guilty of assault with intent to commit rape"]; but see P*eople v. Leal* (2009) 180 Cal.App.4th 782, 793 [holding assault with intent to commit rape and sexual penetration are not lesser included crimes of rape and sexual penetration by artifice, pretense, or concealment since the latter have no element of force].)

Similarly, we conclude that assault with intent to commit sexual penetration is a lesser included offense of forcible sexual penetration. As we have noted, section 220, subdivision (a)(2) prohibits assaulting a person under 18 years of age "with the intent to commit rape, sodomy, oral copulation, or any violation of Section ... 289." (§ 220, subd. (a)(2).) Violations of section 289 include sexual penetration of a minor 14 years of age or older "by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury." (§ 289, subd. (a)(1)(C).) As previously noted, an assault is an unlawful attempt, coupled with a present ability, to commit a harmful or offensive touching. (See § 240.) " '[A]ny harmful or offensive touching constitutes an unlawful use of force or violence' " and is thus a battery. (*People v. Pinholster*, *supra*, 1 Cal.4th at

p. 961; see *People v. Bradbury*, *supra*, 151 Cal. 675 at pp. 676–677.) We conclude that an act of attempting to sexually penetrate someone using force, violence, duress, or menace would be both a harmful and offensive touching. The trial court in this case also instructed the jury that "[a]ssault with intent to commit sexual penetration is a lesser-included offense to the charge[] in Count[] 12."

While assault with intent to commit rape is not a lesser included offense of forcible sexual penetration, we conclude that it is a lesser included offense of sexual penetration as alleged in the information because the information alleged that defendant used his penis to forcibly penetrate G.S.'s vagina. When the jury convicted defendant of forcibly using his penis to penetrate G.S.'s vagina, the jury necessarily found that the defendant committed an act that likely would have resulted in a harmful and offensive touching of G.S. and that defendant intended to use his penis to penetrate G.S.'s vagina.

The parties argue that the information failed to allege that G.S. was not defendant's spouse and, therefore, we cannot modify count 12 to assault of a minor with intent to commit rape or sexual penetration. However, in 1879 our Supreme Court held that an information charging assault with intent to commit rape need not allege that the victim was not the defendant's spouse. (*People v. Estrada* (1879) 53 Cal. 600, 601.)

Furthermore, "[u]nder the accusatory pleading test, a lesser offense is included within the greater charged offense if the *facts* actually alleged in the accusatory pleading include all of the elements of the lesser offense." (*Bailey*, *supra*, 54 Cal.4th at p. 748, italics added.) As we have discussed, the information in this case alleged that defendant committed the crime of sexual penetration of a minor when he used his penis to penetrate G.S.'s vagina, against her will and by means of force, violence, duress, menace, and fear of immediate and bodily injury on G.S. These facts are sufficient to establish that defendant assaulted G.S. and intended to use his penis to sexually penetrate her vagina by use of force, violence, duress, menace, and fear of immediate bodily injury, a crime under section 220, subdivision (a)(2).

26.

Defendant relies on two cases in support of his argument that the information is required to specifically allege that G.S. was not defendant's spouse. In *People v. Miles* (1908) 9 Cal. App. 312, the defendant was charged with rape in violation of section 261. (*Miles*, at p. 313.) The information failed to allege specifically that the woman was not the defendant's wife, and the court dismissed the information after concluding that all elements of an offense must be alleged in the charging document. (*Ibid.*) In *People v. Everett* (1909) 10 Cal. App. 12, the court applied *Miles* to an information that charged assault with intent to commit rape and then described the elements of the crime, but omitted a statement that the victim was not the spouse of the defendant. (*Everett*, at pp. 13–14.) While the information would have been sufficient had it merely charged that the defendant assaulted the victim with the intent to commit rape, the court found the information defective because it chose to set forth the elements of rape and then did so incompletely. (*Ibid*; but see *People v. Bonfanti* (1919) 40 Cal. App. 614, 615 [failure to allege victim of assault with intent to commit rape was not defendant's spouse would not result in dismissal in light of recent amendment to California Constitution that prevented setting aside a conviction based upon any matter of pleading or error of procedure unless the court found a miscarriage of justice].)

In addition, the rules of pleading have changed significantly since *Everett* and *Miles* were decided in 1909 and 1908, respectively. Section 951, as last amended in 1927 (Stats. 1927, ch. 613, § 1), sets forth the form of an information and permits the name of the crime and a statement of the "act or omission, as for example, 'murdered C.D.' " (§ 951.) Section 952, as last amended in 1929 (Stats. 1929, ch. 159, § 1), provides that each count of an information shall contain "a statement that the accused has committed some public offense therein specified. Such statement may be made in ordinary and concise language without any technical averments or any allegations of matter not essential to be proved. It may be in the words of the enactment describing the offense or

declaring the matter to be a public offense, or in any words sufficient to give the accused notice of the offense of which he is accused." (§ 952.)

Our Supreme Court explained that the 1929 amendment to section 952 permits pleading the conclusion that a defendant murdered someone without pleading the words of section 187 that define murder. (*People v. Jordan* (1955) 45 Cal.2d 697, 709; see *People v. Quinn* (1949) 94 Cal.App.2d 112, 115–116 [upholding robbery conviction when information failed to allege all elements of offense and distinguishing older cases decided before § 951 was adopted].) Therefore, a valid information need not allege the elements of the offense.

We also find it significant that when the cases relied upon by defendant were decided, California did not criminalize rape committed on a spouse and, therefore, defendant would not have committed any crime if G.S. was his spouse. In 1979, the Legislature enacted former section 262, which addressed rape of a spouse. (Former § 262, added by Stats. 1979, ch. 994, § 2, p. 3384.)[30] Thus, section 220, subdivision (a) encompasses "rape" as defined in both former section 262 (as to one's spouse) and section 261 (a nonspouse victim). (*People v. Hillard* (1989) 212 Cal.App.3d 780, 783– 784 ["It is evident that the Legislature added [former] Penal Code section 262 for the sole purpose of eliminating the marital exemption for forcible spousal rape, and not to define a new and separate offense, apart from rape by a stranger, of spousal rape."].) Because section 220, subdivision (a)(2) encompasses both rape of a spouse and a nonspouse, it does not matter that the information fails to specify whether G.S. was defendant's spouse.

---

**30** Former section 262 was repealed effective January 1, 2022 (Stats. 2021, ch. 626, § 20), and section 261 applies to all rape victims regardless of their relationship to their rapist except in one circumstance. (See Legis. Counsel's Dig., Assem. Bill No. 1171 (2020–2021 Reg. Sess.) ["This bill would repeal the provisions relating to spousal rape and make conforming changes, thereby making an act of sexual intercourse accomplished with a spouse punishable as rape if the act otherwise meets the definition of rape, except that sexual intercourse with a person who is incapable of giving legal consent because of mental disorder or developmental or physical disability would not be rape if the 2 people are married."].)

(See *People v. Hillard*, at p. 783.)  Further, as we discussed above, by specifically identifying the victim of the crime, the information provided defendant adequate notice of his relationship to the victim.

We will modify the judgment to reflect a conviction for assault of a person under 18 years of age with intent to commit rape in violation of Penal Code section 220, subdivision (a)(2) and remand for resentencing.

The reversal of a sentence on one of several counts authorizes the trial court on remand to consider its discretionary sentencing choices on all counts. " '[U]pon remand for resentencing after the reversal of one or more subordinate counts of a felony conviction, the trial court has jurisdiction to modify every aspect of the defendant's sentence on the counts that were affirmed, including the term imposed as the principal term[.]' " (*People v. Navarro*, *supra*, 40 Cal.4th at p. 681; see also *People v. Buycks* (2018) 5 Cal.5th 857, 893 ["when part of a sentence is stricken on review, on remand for resentencing 'a full resentencing as to all counts is appropriate, so the trial court can exercise its sentencing discretion in light of the changed circumstances' "].)[31]

---

[31]    Effective September 9, 2010, section 667.61, subdivision(j)(2) was amended to increase the punishment for specified crimes on a minor under 14 years of age from a term of 15 years to life to a term of 25 years to life. (Stats. 2010, ch. 219, § 16, p. 1027.)  We asked the parties for supplemental briefing as to whether the trial court erred in sentencing defendant to 15 years to life on counts 2, 3, 14, and 15 and conclude that it did not.  "The federal and state prohibitions against ex post facto laws apply to any statute that punishes as a crime an act previously committed which was not a crime when done or that inflicts greater punishment than the applicable law when the crime was committed." (*People v. Alvarez* (2002) 100 Cal.App.4th 1170, 1178.)  Defendant's crimes occurred both before and after the penalty for violating section 667.61 increased.  Where the jury was not instructed to find that an offense occurred on or after the effective date of the statute and did not, in fact, make such a finding, we consider whether the evidence "leaves no reasonable doubt" the offense occurred on or after that date. (*People v. Hiscox* (2006) 136 Cal.App.4th 253, 261.)  The victims' testimony was not specific enough to leave no reasonable doubt whether the offenses triggering the increased penalty occurred on or after September 9, 2010.  A reviewing court may not "infer that certain acts probably occurred after that date" or "hypothesize ... what dates might be attached to certain acts based on ambiguous evidence." (*Ibid*.)

**II.    Count 8 Should Be Stayed Pursuant to section 654 Because it Involved the Same Act of Forcible Sodomy as Charged in Count 9**

**A.    Background**

G.S. testified that defendant sodomized her approximately 10 to 15 times, but only once before she turned 14 years old. During closing argument, the prosecutor explained that this conduct was the basis of count 8, a lewd act upon a child under 14 years of age (§ 288, subd. (a)). She also argued the single time defendant sodomized G.S. before she was 14 years old as the basis of the crime of aggravated sexual assault of a child under 14 years of age by forcible sodomy as charged in count 9 (§ 269, subd. (a)(3)).

**B.    Applicable Law**

Former section 654 provided, in relevant part, "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." (Former § 654, subd. (a).)[32] The statute "expressly prohibits separate punishment for two crimes based on the same act, but has been interpreted to also preclude multiple punishment for two or more crimes occurring within the same course of conduct pursuant to a single intent." (*People v. Vargas* (2014) 59 Cal.4th 635, 642; accord, *People v. Harrison* (1989) 48 Cal.3d 321, 335.) Determining "[w]hether a defendant may be subjected to multiple punishment under section 654 requires a two-step inquiry." (*People v. Corpening* (2016) 2 Cal.5th 307, 311.) "We first consider if the different crimes were completed by a 'single physical act.' [Citation.] If so, the defendant may not be punished more than once for that act. Only if we conclude that the case involves more than a single act—i.e.,

---

[32]    Section 654 has been amended since defendant was sentenced, but the language "in no case shall the act or omission be punished under more than one provision" remains unchanged. (§ 654.)

a course of conduct—do we then consider whether that course of conduct reflects a single 'intent and objective' or multiple intents and objectives." (*Ibid*.)

"Whether a defendant will be found to have committed a single physical act for purposes of section 654 depends on whether some action the defendant is charged with having taken separately completes the actus reus for each of the relevant criminal offenses." (*People v. Corpening*, *supra*, 2 Cal.5th at p. 313.) The relevant inquiry is whether " 'a separate and distinct act can be established as the basis of each conviction.' " (*People v. Beamon* (1973) 8 Cal.3d 625, 637, overruled on another ground in *People v. Mendoza* (2000) 23 Cal.4th 896, 908; accord, *Corpening*, at p. 316.)

### C.     Analysis

In the present case, defendant argues that his convictions for lewd acts upon a child and aggravated sexual assault of a child by forcible sodomy are based on the single time that defendant sodomized G.S. before she turned 14 years old. The People agree that section 654 requires the execution of the sentence on count 8 be stayed. We agree that defendant cannot be sentenced on both count 8 and count 9 and that one of these sentences must be stayed. We will remand to the trial court with directions to stay the sentence on either count 8 or count 9.

At the time of sentencing, former section 654, subdivision (a), required that a defendant who committed an act punishable by two or more provisions of law to be punished under the provision that provided for the longest possible term. (Stats. 1997, ch. 410, § 1.) Effective January 1, 2022, Assembly Bill No. 518 (2021–2022 Reg. Sess.) amended section 654, subdivision (a), to permit an act or omission punishable under two or more provisions of law to "be punished under either of such provisions." (§ 654, subd. (a), as amended by Stats. 2021, ch. 441, § 1.) Thus, under the new law, a trial court now has the discretion to punish a defendant under any of the applicable laws.

31.

Under *In re Estrada* (1965) 63 Cal.2d 740, "[w]hen the Legislature has amended a statute to reduce the punishment for a particular criminal offense, we will assume, absent evidence to the contrary, that the Legislature intended the amended statute to apply to all defendants whose judgments are not yet final on the statute's operative date." (*People v. Brown* (2012) 54 Cal.4th 314, 323, fn. omitted.) Where an ameliorative statute like this one is retroactive, a remand is appropriate unless "the record 'clearly indicate[s]' that the trial court would have reached the same conclusion 'even if it had been aware that it had such discretion.' " (*People v. Gutierrez* (2014) 58 Cal.4th 1354, 1391.)

Because we are remanding for resentencing due to our modification of the conviction on count 12, at resentencing the trial court will have the opportunity to exercise its discretion to apply section 654 to stay execution of the sentence on either count 8 or 9 under the new law.

## III. Defendant Was Not Deprived of His Sixth Amendment Right to a Unanimous Jury by the Trial Court's Instructions to the Jury After Substituting an Alternate Juror

Defendant argues that the trial court deprived him of his state and federal rights to a unanimous jury when it substituted an alternate juror after the first day of deliberations. The People initially responded and argued that the error was merely one of state law. After the People filed their responding brief, the United States Supreme Court held that the Sixth Amendment right to a unanimous jury is applicable to the states through the Fourteenth Amendment. (*Ramos v. Louisiana* (2020) ___ U.S. ___, ___ [140 S.Ct. 1390, 1391] (*Ramos*).) Defendant relies upon *Ramos* to argue that the trial court's instructional error is a structural error and not subject to harmless error review. We ordered supplemental briefing by the People as to this issue. We conclude the trial court did not err. Even if the trial court did err, we conclude the error is subject to review for harmlessness and apply the harmless error test for federal constitutional error—whether it appears beyond a reasonable doubt that the error complained of did not contribute to the

32.

verdict obtained—to the trial court's instructional error in substituting the alternate juror. (See *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*).)

### A.     Background

Prior to the jury deliberating, the trial court advised the alternate jurors:

"To my alternate jurors, you two at the end, the jury will soon begin deliberations, but you are still alternate jurors and bound by my earlier instructions on your conduct. Do not talk about the case or about any of the people or any subject involved with anyone, not even family, friends, not even with each other. Don't have any contact with the deliberating jurors. Do not decide how you would vote if you were deliberating. Do not form or express any opinions about the issues in this case unless you are substituted in as one of the deliberating jurors.

"You two, as long as I have a phone number where I can reach you, that you can come back and be back within an hour, you are free to go. You can wait around if you want to do that this afternoon. That's fine, but you just can't participate in the deliberations."

The jury began deliberations on June 11, 2019, at approximately 1:30 p.m. At 4:37 p.m., the trial court brought the jury to the courtroom to ascertain whether to send them home until the next day. The court inquired as to whether the jury's deliberations might be resolved in the next 15 or 20 minutes. One juror replied, "We are on number 11 for the counts. [¶] We definitely need more than 20 minutes. [¶] We're going to ask for read back." The juror later added, "I don't think we're going to take that much longer. [¶] We are putting a request for Adrian Mendoza's testimony, though."[33] The court commented that the court reporter could read back that testimony the following day in the jury room. After the court instructed the jurors that they were being sent home for the day, one juror reminded the court that the juror was scheduled to fly the next day and the court excused that juror. The court then explained to the remaining 11 jurors:

"One of the things that will happen is when you all get here, I will read you an instruction. We'll substitute the [alternate] juror in, but, in

---

**33**     Mendoza was the criminalist who testified concerning the DNA test results.

effect, your deliberations have to start all over. It shouldn't take long for the [alternate] to get caught up to date."

The following colloquy then took place:

"JUROR: I know we have to start our deliberation all over. Will we get to keep our previous deliberations to refer back to them or are they destroyed?[34]

"THE COURT: You need to make sure that [the alternate] juror is up to date. Se[e] if that juror can agree. If you start anew, in effect those verdicts have to be redone.

"JUROR: Okay. If they do agree, they are still hunkeydorie [*sic*], correct?

"THE COURT: I can tell you if you want to return those verdicts, right now we can take those verdicts.[35]

"JUROR: No, he probably wants us to start over.

"THE COURT: Okay. See you tomorrow at 9:00[ a.m].

"[THE PROSECUTOR]: If [the alternate] juror agrees with what has already been decided on, it's okay?

"THE COURT: It is."

---

**34** The juror's reference to keeping or destroying their "previous deliberations" was not clarified but appears to refer to completed verdict forms as to the 10 or 11 counts for which they had completed deliberations (the juror previously advised the court the jury was "on number 11").

**35** "[W]hen the court is going to discharge a deliberating juror and replace that juror with an alternate, the court should determine whether any verdicts have been reached before discharging the juror.… The juror may then be discharged, an alternate seated to replace the juror, and the newly constituted jury instructed to begin its deliberations anew on any remaining charges and allegations." (*People v. Garcia* (2012) 204 Cal.App.4th 542, 552, italics omitted; see *People v. Thomas* (1990) 218 Cal.App.3d 1477, 1485 [trial court did not err in receiving partial verdict before replacing juror]; *People v. Aikens* (1988) 207 Cal.App.3d 209, 211 [same]; *People v. Cain* (1995) 10 Cal.4th 1, 67–68, overruled on other grounds in *People v. Moon* (2005) 37 Cal.4th 1, 17.) However, the court is not required to accept partial verdicts under such circumstances. (*People v. Sanborn* (2005) 133 Cal.App.4th 1462, 1468.)

The trial court excused the jury until the following day.  When proceedings resumed, the trial court advised the parties that it would need to formally substitute the alternate juror in and brought the jury into the courtroom.  The court then instructed the jury, reading CALCRIM No. 3575:

> "So, ladies and gentlemen of the jury, one of your fellow jurors has been excused, and you were aware of that yesterday, and our alternate juror has been selected to join you.
>
> "Do not consider this substitution for any purpose.  The alternate juror must participate fully in the deliberations that lead to any verdict.
>
> "The People and the defendant have a right to a verdict reached only after full participation of the jurors whose votes determine the verdict.  This right will only be assured if you begin your deliberations again from the beginning.  Therefore, you must set aside and disregard all past deliberations and begin your deliberations all over again.
>
> "Each of you must disregard your earlier deliberations and decide this case as if those earlier deliberations had not taken place.
>
> "Now, please return to the jury room and start your deliberations from the beginning.
>
> "One of the things that was discussed yesterday is that you may want the testimony of Adrian Mendoza be read.  So when you get in there and you are ready for that, please let me know and I will send [the court reporter] in to read back that testimony.
>
> "With that in mind, please retire to the jury room and begin your deliberations.  Thank you."

The jury returned to the jury room to commence deliberations at 9:07 a.m.  At 10:03 a.m., the jury sent a question to the court:  "May we have Adrian Mendoza's, [M.C.]'s, and [G.S.]'s testimonies?"  The court reporter entered the jury room at 10:06 a.m. and completed readback of the requested testimony at 11:43 a.m.  The jury submitted a second question to the court at 1:17 p.m.:  "Can you better explain the 'multiple victims' special allegation?"  The court provided a written response to the jury at 1:30 p.m.  At 2:05 p.m., the foreperson informed the bailiff that the jury had reached its

verdicts.  After reading the verdicts into the record, the trial court asked, "Ladies and gentlemen of the jury, are these your verdicts?"  The jury responded, "Yes."  Responding to an inquiry by the trial court, the prosecutor and defense counsel advised they did not desire to have the court poll the jury.

**B.** Applicable Law

*1.* *California Constitutional Right to Jury Trial*

Section 1089 provides in relevant part:

> "If at any time, whether before or after the final submission of the case to the jury, a juror dies or becomes ill, or upon other good cause shown to the court is found to be unable to perform his or her duty, or if a juror requests a discharge and good cause appears therefor, the court may order the juror to be discharged and draw the name of an alternate, who shall then take a place in the jury box, and be subject to the same rules and regulations as though the alternate juror had been selected as one of the original jurors." (§ 1089, 5th par.)

Our Supreme Court addressed the constitutionality of this provision in *People v. Collins* (1976) 17 Cal.3d 687 (*Collins*).  "The principal question before us is whether the substitution of an alternate for an original juror is constitutionally permissible after deliberations have begun.…  [W]e conclude that such substitution is permissible when good cause has been shown and the jury has been instructed to begin deliberations anew." (*Id*. at p. 691, superseded by statute on another ground as stated in *People v. Boyette* (2002) 29 Cal.4th 381, 462, fn. 19.)  *Collins* recognized that an essential element of the right to trial by jury included that a jury in a felony prosecution consist of 12 persons and that its verdict be unanimous.  (*Collins*, at p. 693.)  *Collins* also agreed that this element was part of the broader right that requires each juror to have engaged in all of the jury's deliberations and elaborated:

> "The requirement that 12 persons reach a unanimous verdict is not met unless those 12 reach their consensus through deliberations which are the common experience of all of them.  It is not enough that 12 jurors reach a unanimous verdict if 1 juror has not had the benefit of the deliberations of

the other 11.  Deliberations provide the jury with the opportunity to review the evidence in light of the perception and memory of each member.  Equally important in shaping a member's viewpoint are the personal reactions and interactions as any individual juror attempts to persuade others to accept his or her viewpoint.  The result is a balance easily upset of a new juror enters the decision-making process after the 11 others have commenced deliberations.  The elements of number and unanimity combine to form an essential element of unity in the verdict.  By this we mean that a defendant may not be convicted except by 12 jurors who have heard all the evidence and argument and who together have deliberated to unanimity."  (*Collins*, *supra*, 17 Cal.3d at p. 693.)

To protect this right, *Collins* construed section 1089 to require that deliberations begin anew when a substitution is made after final submission to the jury.  (*Collins*, *supra*, 17 Cal.3d at p. 694.)  The trial court, therefore, when replacing an alternate juror during deliberations must:

"[I]nstruct the jury to set aside and disregard all past deliberations and begin deliberating anew.  The jury should be further advised that one of its members has been discharged and replaced with an alternate juror as provided by law; that the law grants to the People and to the defendant the right to a verdict reached only after full participation of the 12 jurors who ultimately return a verdict; that this right may only be assured if the jury begins deliberations again from the beginning; and that each remaining original juror must set aside and disregard the earlier deliberations as if they had not been had.  We are confident that juries made aware of the rights involved will faithfully follow such instructions."  (*Collins*, *supra*, 17 Cal.3d at p. 694.)

### 2.    Sixth Amendment

"Unanimity in jury verdicts is required where the Sixth … Amendment appl[ies]."  (*Andres v. United States* (1948) 333 U.S. 740, 748 ["In criminal cases this requirement of unanimity extends to all issues—character or degree of the crime, guilt and punishment—which are left to the jury."].)  The United States Supreme Court held in 2020 that the Sixth Amendment's right to a unanimous jury applies to state criminal trials through the Fourteenth Amendment.  (*Ramos*, *supra*, ___ U.S. at p. ___ [140 S.Ct. at p. 1397] ["So if the Sixth Amendment's right to a jury trial requires a unanimous verdict to support a

conviction in federal court, it requires no less in state court."].) The United States Supreme Court has also described the essential feature of a jury trial:

> "The purpose of the jury trial … is to prevent oppression by the Government. 'Providing an accused with the right to be tried by a jury of his peers gave him an inestimable safeguard against the corrupt or overzealous prosecutor and against the compliant, biased, or eccentric judge.' [Citation.] Given this purpose, the essential feature of a jury obviously lies in the interposition between the accused and his accuser of the commonsense judgment of a group of laymen, and in the community participation and shared responsibility that results from that group's determination of guilt or innocence." (*Williams v. Florida* (1970) 399 U.S. 78, 100 [holding that criminal jury may be less than 12 members].)

However, the United States Supreme Court has not considered whether the Sixth Amendment permits the substitution of an alternate juror after deliberations have begun, and if so, whether the Sixth Amendment mandates any specific procedures, such as an instruction to deliberate anew. We could find no federal case that found a Sixth Amendment violation when the trial court failed to instruct the jury to begin its deliberations anew after the substitution of juror.[36] "The only circuit court that has addressed this issue concluded that substituting an alternate juror without instructing the jury to commence its deliberations anew is not constitutional error." (*Peek v. Kemp* (11th Cir. 1986) 784 F.2d 1479, 1485 (*Peek*), citing *United States v. Evans* (4th Cir. 1980) 635 F.2d 1124, 1127–1128 (*Evans*).)

---

[36] Until 1999, the federal rules did not permit federal district courts to substitute alternates after deliberations had commenced. (See, e.g., *United States v. Houlihan* (1st Cir. 1996) 92 F.3d 1271, 1285, quoting Fed. Rules Crim.Proc., former rule 24(c), 18 U.S.C. ["The imperative of Rule 24(c) is clear and categorical: 'An alternate juror who does not replace a regular juror shall be discharged after the jury retires to consider its verdict.' [Citation.] The rule reflects the abiding concern that, once a criminal case has been submitted, the jury's deliberations shall remain private and inviolate."].) Effective December 1, 1999, rule 24(c)(3) of the Federal Rules of Criminal Procedure (18 U.S.C.) was amended to permit a district court to substitute an alternate juror during deliberations if the court instructs the jury to "begin its deliberations anew." (Fed. Rules Crim.Proc., rule 24(c)(3), as amended Apr. 26, 1999, 18 U.S.C.)

The federal circuit courts that have considered the issue have done so in the context of holding or impliedly finding that the Sixth Amendment does not categorically prohibit the mid-deliberation substitution of an alternate juror, as well as addressing the violation of former rule 24(c)(3) of the Federal Rules of Criminal Procedure (18 U.S.C.) that prohibited substitution.  (See *United States v. James* (3d Cir. 2020) 955 F.3d 336, 348 (*James*) [finding no constitutional violation "[b]ecause all deliberating jurors heard all of the evidence and were properly instructed, and there is nothing in the record suggesting that the deliberating jurors lacked impartiality or the competence to understand the evidence and the instructions, or that the excused juror tainted or otherwise impaired the reconstituted jury that delivered the verdict" (fn. omitted)]; *United States v. Oscar* (11th Cir. 2017) 877 F.3d 1270, 1289–1290 [holding district court did not abuse its discretion in substituting two jurors after jury had been deliberating for 21 hours where instructed jury to begin deliberations anew, jury renewed deliberations for 9 hours thereafter and acquitted the defendant of two counts, thus indicating it fairly and thoroughly evaluated the evidence]; *United States v. Cencer* (6th Cir. 1996) 90 F.3d 1103, 1109–1110 [holding defendant may waive Fed. Rules Crim.Proc., former rule 24(c), 18 U.S.C., which permitted substitution of alternate only before deliberations commence]; *Claudio v. Snyder* (3d Cir. 1995) 68 F.3d 1573, 1576 (*Claudio*) ["federal courts have generally ruled that the substitution of a juror after deliberations have begun does not violate the United States Constitution, provided that defendants suffered no prejudice as a result"]; *Peek*, *supra*, 784 F.2d at pp. 1484–1485 (en banc) [no Sixth Amendment violation even where no instruction to jury to start deliberations anew where defense counsel did not object to the lack of supplementary instructions when alternate juror was substituted, and the jury was not prevented from starting its deliberations from the beginning on its own]; *Miller v. Stagner* (9th Cir. 1985) 757 F.2d 988, 995 (*Miller*) [holding, in conclusory terms, that substitution of alternate jurors during deliberations did not violate federal constitutional rights because § 1089 and trial court's procedures

preserved "the 'essential feature' " of the jury required by the 6th Amend.]; *United States v. Hillard* (2d Cir. 1983) 701 F.2d 1052, 1057 (*Hillard*) [finding no 6th Amend. violation by substitution of alternate where length of deliberations and "discriminating verdicts" supported substitution not prejudicial]; *United States v. Phillips* (5th Cir. 1981) 664 F.2d 971, 990–993 (*Phillips*) [substitution of alternate juror in violation of Fed. Rules Crim.Proc., former rule 24(c), 18 U.S.C. does not violate 6th Amend.], overruled on other grounds by *United States v. Huntress* (5th Cir.1992) 956 F.2d 1309, 1317; *Evans*, *supra*, 635 F.2d at pp. 1126–1128 [defendant permitted to waive prohibition of substitution of juror after deliberations commenced and no fundamental unfairness and nothing precluded jury from starting deliberations anew even though jury not instructed to do so]; *Henderson v. Lane* (7th Cir. 1980) 613 F.2d 175, 178–179 [while substitution might undermine unanimity requirement of Fed. Rules Crim.Proc., rule 23(b), 18 U.S.C., relies upon Supreme Court case that upheld nonunanimous verdicts in state cases to find no constitutional violation].)

These courts are split on the importance of an instruction to deliberate anew in assessing the constitutional validity of a mid-deliberation juror substitution and have not addressed whether the court must specifically instruct the jurors to disregard the prior deliberations. The Second, Third, Fifth, and Ninth Circuit Courts of Appeals have generally concluded that an instruction to deliberate anew is a procedural safeguard to preserve the "essential feature" of the Sixth Amendment right to trial by jury and have generally found no Sixth Amendment violation and no prejudice where the trial court expressly or constructively instructed the jury to begin deliberations anew. (See *James*,

*supra*, 955 F.3d at pp.341, 348;[37] *Claudio*, *supra*, 68 F.3d at p. 1577;[38] *Miller*, *supra*, 757 F.2d at p. 995; *Hillard*, *supra*, 701 F.2d at pp. 1055–1057; *Phillips*, *supra*, 664 F.2d at pp. 990–993.) When determining the existence of a Sixth Amendment violation or assessing prejudice, these courts have made highly fact-specific inquiries and (1) considered any other procedural safeguards that preserved the jury's "essential feature," and (2) compared the length of pre-substitution deliberations with the length of post-substitution deliberations.

The Fourth, Sixth, Seventh, and Eleventh Circuit Courts of Appeals have placed less emphasis on supplemental instructions to begin deliberations anew, have generally found it more relevant whether the reconstituted jury was actively prevented from deliberating anew, but like the other circuit courts of appeals discussed above, have also made fact-specific inquiries focused on the overall procedural safeguards that were in place to preserve the jury's "essential feature." (See *United States v. Cencer*, *supra*, 90 F.3d at pp. 1109–1110; *Peek*, *supra*, 784 F.2d at pp. 1484–1485; *Evans*, *supra*, 635 F.2d at pp. 1126–1128; *Henderson v. Lane*, *supra*, 613 F.2d at pp. 178–179.)

Not unexpectedly, we have been unable to find any published California opinion addressing the *Collins* issue in the context of the Sixth Amendment since *Ramos* was

[37] The district court instructed the jury: "(1) to 'restart' its deliberations 'as though you are starting from scratch,' … (2) 'there is no rush to reach a verdict;' … (3) the verdict 'must be considered and deliberate;' … and (4) the new juror 'should feel as though he is beginning anew, not ... interposing or becoming someone who is interrupting an ongoing process.' " (*James*, *supra*, 955 F.3d at p. 341.)

[38] "The trial court instructed the original jurors to 'take whatever time is necessary' *to completely inform the replacement juror of all previous deliberations and of each juror's individual point of view.* It also instructed the replacement juror to guard against the inclination to proceed before she was thoroughly familiar with the evidence and the views of the other jurors.… The instructions were designed to eliminate any disadvantage that the alternate juror may have felt as a result of her late introduction into the deliberations and to ensure her full, effective, and uncoerced participation in all aspects of the deliberations." (*Claudio*, *supra*, 68 F.3d at p. 1577, italics added; but see *Collins*, *supra*, 17 Cal.3d at p. 694 [jury must be instructed "that each remaining original juror *must set aside and disregard the earlier deliberations as if they had not been had*" (italics added)].)

decided.  However, our review of the federal cases above demonstrate that a jury need only be instructed as to deliberate anew while the California Constitution requires additional advisements, including that the jurors set aside all prior deliberations.  (See *Collins*, *supra*, 17 Cal.3d at pp. 694, 697.)  Therefore, we will assume that the Sixth Amendment right is coextensive with California's constitutional right to a jury trial as we have concluded that the trial court's instructions complied with the California Constitution.

### 3.    *Ambiguous Jury Instructions*

An ambiguous jury instruction amounts to a federal constitutional violation only if there is " 'a reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution."  (*Estelle v. McGuire* (1991) 502 U.S. 62, 72, quoting *Boyde v. California* (1990) 494 U.S. 370, 380.)  These cases articulate a standard that applies to "claims that allegedly ambiguous instructions caused jury confusion."  (*Jones v. United States* (1999) 527 U.S. 373, 390.)  Instructional errors that violate defendant's rights under both the United States and California Constitutions are subject to harmless error review under *Chapman*, *supra*, 386 U.S. at p. 24.  (*People v. Mil* (2012) 53 Cal.4th 400, 409.)

### 4.    *Harmless Error Review*

We disagree with defendant's assertion that an error in instructing the jury upon substitution of an alternate juror is a structural error that is not subject to harmless error review.  The United States Supreme Court has recognized structural error in a very limited class of cases.  These include:  (1) the total deprivation of the right to counsel (*Gideon v. Wainwright* (1963) 372 U.S. 335); (2) a biased trial judge (*Tumey v. Ohio* (1927) 273 U.S. 510); (3) unlawful exclusion of grand jurors of the defendant's race (*Vasquez v. Hillery* (1986) 474 U.S. 254); (4) denial of self-representation at trial (*McKaskle v. Wiggins* (1984) 465 U.S. 168); (5) denial of right to a public trial at a

suppression hearing (*Waller v. Georgia* (1984) 467 U.S. 39); (6) a defective reasonable doubt instruction (*Sullivan v. Louisiana* (1993) 508 U.S. 275); and (7) a defendant's right to have all critical stages of a criminal trial conducted by a person with jurisdiction to preside (*Gomez v. United States* (1989) 490 U.S. 858, 876 [harmless error analysis does not apply in a felony case in which, despite the defendant's objection and without any meaningful review by a district judge, an officer exceeds his jurisdiction by selecting a jury]).

Other than in these limited, restricted classes of cases, the Supreme Court has failed to find structural error in the wide range of errors presented to it. When the Supreme Court speaks of a structural defect, it means that "[t]he entire conduct of the trial from beginning to end is obviously affected by the [error]." (*Arizona v. Fulminante* (1991) 499 U.S. 279, 309–310 (*Arizona*).) It is clear that when the Supreme Court speaks of structural error, the court is referring to something which affects the entire framework of the trial and not something which may have differing degrees of impact, depending on other trial factors. (*United States v. Olano* (1993) 507 U.S. 725, 737, citing & quoting Fed. Rules Crim.Proc., rule 52(b), 18 U.S.C. [the "presence of alternate jurors during jury deliberations is not the kind of error that 'affect[s] substantial rights' independent of its prejudicial impact"].) "[I]f the defendant had counsel and was tried by an impartial adjudicator, there is a strong presumption that any other errors that may have occurred are subject to harmless-error analysis." (*Rose v. Clark* (1986) 478 U.S. 570, 579.)[39]

" 'Under article VI, section 13 of our state Constitution, trial error does not merit reversal of a judgment unless "the error complained of has resulted in a miscarriage of justice." Typically, a defendant who has established error under state law must demonstrate there is a reasonable probability that in the absence of the error he or she would have obtained a more favorable result.' " (*People v. Anzalone* (2013) 56 Cal.4th

---

[39] Defendant has not argued that the jury was biased or coerced.

545, 553; see *People v. Watson* (1956) 46 Cal.2d 818, 836.) As our Supreme Court has recognized, "Categorization of an error as structural represents 'the exception and not the rule.' " (*People v. Sivongxxay* (2017) 3 Cal.5th 151, 178; see *People v. Marshall* (1996) 13 Cal.4th 799, 851 ["[t]here is a strong presumption any error" is susceptible to harmless error analysis].) "The fact that an error implicates important constitutional rights does not necessarily make it structural." (*Sivongxxay*, at p. 178.) "The 'miscarriage of justice' language within article VI, section 13 of the California Constitution likewise contemplates a limited class of structural errors … ' "that … may result in a 'miscarriage of justice' because they operate to deny a criminal defendant the constitutionally required 'orderly legal procedure' (or, in other words, a fair trial)—for example, the denial of the defendant's right to a jury trial or to an impartial trial judge [citation]—[and] all involve fundamental 'structural defects' in the judicial proceedings .…" ' " (*Id.* at p. 179.)

Our Supreme Court recognized that instructional error regarding a jury's duty to deliberate anew upon substitution of an alternate juror is not structural and subject to state harmless error review. (*Collins*, *supra*, 17 Cal.3d at pp. 697–698.) The court explained, "When as here the error is not of federal constitutional dimensions and does not fall within certain exceptions not here applicable, we are committed to the prejudicial error rule enunciated in *People v. Watson*, *supra*, 46 Cal.2d 818, without regard to whether the error offends fundamental as compared to other rights. [Citation.] We noted with approval in *Watson* 'that generally, error involving the infringement of a constitutional right, like any other error, requires a further determination whether the defendant has been prejudiced, and the final test is the "opinion" of the reviewing court, in the sense of its belief or conviction, as to the effect of the error .…' " (*Id.* at p. 697, fn. 5.)

Of course, at the time *Collins* was decided, the United States Supreme Court had ruled that the Sixth Amendment (as applied to the states through the Fourteenth Amendment) did not require unanimous jury verdicts in state criminal trials. (*Apodaca v. Oregon* (1972) 406 U.S. 404, 406.) The United States Supreme Court now recognizes

44.

that the Sixth Amendment requires juror unanimity in state courts as well as federal courts. (*Ramos*, *supra*, ___ U.S. at p. ___ [140 S.Ct. at p. 1397.) We see no reason to conclude that our Supreme Court would revisit applying harmless error analysis now that juror unanimity is required by the Sixth Amendment as well as the California Constitution.[40] If the error were structural, our Supreme Court would have recognized it as such under the California Constitution because it uses United States Supreme Court authority for that analysis. (See, e.g., *People v. Lewis* (2021) 11 Cal.5th 952, 973–974 [relying on *Arizona*, *supra*, 499 U.S. 279 to conclude that failure to appoint counsel at outset of § 1170.95 petition to pursue collateral relief is state error not rising to structural error]; *People v. Gonzalez* (2018) 5 Cal.5th 186, 195–199 [citing *Arizona*, at pp. 306–310 when analyzing the type of error resulting from failure to instruct on lesser included offenses]; *People v. Merritt* (2017) 2 Cal.5th 819, 825–831 [rejecting argument that failure to instruct on multiple elements of robbery was structural error not amenable to harmless error review, though recognizing that an instructional error or omissions amounting to total deprivation of jury would be reversible per se]; *People v. Reese* (2017) 2 Cal.5th 660, 712–715 [relying on *Arizona*, at pp. 307–310 to hold that erroneous withholding of portion of trial transcript subject to *Chapman* harmless error review even though total denial of transcript is a structural error reversible per se].)[41]

Moreover, defendant has failed to identify a single case that treated the trial court's instructional error when substituting an alternate juror during deliberations as reversible per se. As our review of the federal cases above indicates, federal courts have

---

**40** Of course, because the instructional error would now affect defendant's rights under both the United States and California Constitutions, it subject to harmless error review under *Chapman*, *supra*, 386 U.S. 18 as discussed above.

**41** "Although the question whether a constitutional violation is structural or trial error is generally thought to be categorical, the harmless error status of certain constitutional violations is neither binary nor fixed. Certain errors can shift between being structural or subject to harmless error review depending on the nature and extent of the violation." (*People v. Reese*, *supra*, 2 Cal.5th at p. 712.)

not set aside convictions where an alternate has been replaced during deliberations without a finding of prejudice. (See *James*, *supra*, 955 F.3d at p. 341;[42] *Claudio*, *supra*, 68 F.3d at p. 1577; *Miller*, *supra*, 757 F.2d at p. 995; *Hillard*, *supra*, 701 F.2d at pp. 1055–1057; *Phillips*, *supra*, 664 F.2d at pp. 990–993.)

We reject defendant's argument that the instructional error in this case is structural and incapable of review for harmlessness.

**C.** <u>Analysis</u>

*1.* *The Trial Court Did Not Err in Instructing the Jury to Deliberate Anew*

As discussed above, *Collins* held that in situations where a juror is replaced with an alternate juror, the court must instruct the jury: (1) to set aside and disregard all past deliberations and begin deliberating anew; (2) that one of its members has been discharged and replaced with an alternate juror as provided by law; (3) that the law grants to the People and to the defendant the right to a verdict reached only after full participation of the 12 jurors who ultimately return a verdict and that this right may only be assured if the jury begins deliberations again from the beginning; and (4) that each remaining original juror must set aside and disregard the earlier deliberations. (*Collins*, *supra*, 17 Cal.3d at p. 694.) In this case, after seating the alternate juror, the trial court advised the jury as follows: (1) one juror had been excused and replaced with an alternate (and not to consider the substitution for any purpose); (2) the alternate juror must participate fully in the deliberations that lead to any verdict; (3) the People and the defendant have a right to a verdict reached only after full participation of the jurors whose votes determine the verdict and this right will only be assured if the jurors begin

---

[42] The district court instructed the jury: "(1) to 'restart' its deliberations 'as though you are starting from scratch,' … (2) 'there is no rush to reach a verdict;' … (3) the verdict 'must be considered and deliberate;' … and (4) the new juror 'should feel as though he is beginning anew, not ... interposing or becoming someone who is interrupting an ongoing process,' " but did not instruct the jury to disregard its prior deliberations. (*James*, *supra*, 955 F.3d at p. 341.)

their deliberations again from the beginning; (4) each juror must set aside and disregard all past deliberations; and (5) all jurors should begin their deliberations all over again. The court repeated, "Each of you must disregard your earlier deliberations and decide this case as if those earlier deliberations had not taken place. [¶] Now, please return to the jury room and start your deliberations from the beginning."

Defendant acknowledges the trial court correctly instructed the jury to begin deliberations anew but takes issue with the court's comments made the day before and after reading the formal instruction. The day before substituting the alternate juror, the trial court dismissed one of the original jurors and explained to the remaining jurors the procedure that would follow: "I will read you an instruction. We'll substitute the [alternate] juror in, but, in effect, your deliberations have to start to all over. It shouldn't take long for the [alternate] juror to get up to date." One juror acknowledged that they would start deliberations over but asked, "Will we get to keep our previous deliberations to refer back to them or are they destroyed?" In context, we conclude that the juror was referring to verdict forms for the 10 or 11 counts that had been reviewed prior to the substitution. When the court replied, "Se[e] if that juror can agree" and that "those verdicts have to be redone," we understand the trial court was advising that if the decisions as to those counts were unchanged after deliberations with the alternate juror, then the jury would not need to complete the verdict forms again. The trial court confirmed this understanding when it immediately offered to accept the completed verdict forms. The juror indicated their understanding of the trial court's comments when the juror responded, "No, he probably wants us to start over." The juror's statement communicated that instead of continuing deliberations with the alternate juror as to only the remaining counts, the jury wished to start over to include the alternate juror on deliberations for the counts that had already been subject to their deliberations.

If there had been any confusion, we believe such confusion was dispelled by the formal instruction provided to the jury the following day. In light of the trial court's

47.

unequivocal statements when seating the alternate juror that the jury needed to start deliberating all over and that all 12 jurors had to discuss the case to reach a verdict, we do not believe that the jury could have been confused about its obligation to start the deliberations over. The alternate juror was not present the previous day and could not have been confused by any earlier statements. Based upon the trial court's instruction that morning, the alternate juror would be expecting full deliberations on all of the charges. The original jury did not return the 10 completed verdict forms the prior day and elected to deliberate over again with the alternate juror. If the alternate juror had not been permitted to deliberate as to all of the charges because any juror failed to understand the trial court's instructions, we believe that the resulting confusion would have resulted in a question to the court for guidance.

Before the alternate juror was substituted, the original jury had indicated to the court its intent to request readback of Mendoza's testimony but had not done so. The trial court, after reading the formal instruction to deliberate anew to the newly constituted jury, reminded the jury that there was discussion the day before regarding readback of testimony. The trial court commented to the jury, "So when … you are ready for that, please let me know and I will send [the court reporter] to read back that testimony." Defendant argues that the trial court's statement created confusion that caused the jury disregard the formal instruction to deliberate anew.

Citing to *People v. Guillen* (2014) 227 Cal.App.4th 934, 1029–1031 (*Guillen*), defendant claims the trial court's comments, made after the required admonition, undermined its instruction to restart deliberations. In *Guillen*, the trial court properly gave CALCRIM No. 3575 (as the trial court did here) but made other comments the appellate court concluded implied the jury should not disregard previous deliberations. (*Guillen*, at p. 1030.) In *Guillen*, the jury submitted a request to the trial court that included questions and a request for readback of testimony. (*Id*. at pp. 979–980.) While the trial court was consulting with counsel on responding to the request, but before the

jury had returned for deliberations, a juror became incapacitated. (*Id.* at p. 980.) The trial court and counsel agreed to replace the juror with an alternate, respond to the questions posed, and to arrange for the readback despite the change to the jury. When the trial resumed, the court advised the original 11 jurors and the alternate juror that it had responded to the questions on the original jury's form and had arranged for the court reporter to reread testimony. (*Ibid.*) The trial court then read CALCRIM No. 3575, complying with *Collins*, *supra*, 17 Cal.3d at p. 694. (*Guillen*, at p. 981.) Immediately thereafter, the trial court stated, "The first thing you're going to get is a reread." (*Ibid.*) The court held:

> "Here, based on a complete reading of the trial court's statements, we conclude the court improperly implied the jury should not disregard previous deliberations. After the court clerk swore in the alternate juror, the court stated it had received the jury's request for readback of testimony. But those requests were from the original jury. By having the testimony read back, the court answered the original jury's request despite the fact one juror was excused and the alternate juror did not participate in the deliberations that led to the requests. Although the court then instructed the jury with the proper instruction, CALCRIM No. 3575, which included the directive the alternate juror must fully participate in the deliberations, the court's prior statements, like in [*People v.*] *Odle* [(1988) 45 Cal.3d 386, 405], *implied* the jury should not disregard previous deliberations but should instead attempt to bring the alternate juror 'up to speed' on the matters already discussed and possibly decided based on the requests the original jury submitted to the trial court." (*Guillen*, *supra*, 227 Cal.App.4th at p. 1030.)

In *People v. Odle* (1988) 45 Cal.3d 386 (*Odle*), the trial court made the following statements to the jury: " 'The court is compelled under the law to admonish you that you are to start your deliberations from scratch because, obviously, … [the alternate] has not had the benefit of whatever discussions you have had so far.… Start your discussions from scratch so that [the alternate juror] has full benefit of everything that has gone on between the jury up to the present time.' " (*Id.* at p. 405, second bracketed insertion added, abrogated on another ground as stated in *People v. Prieto* (2003) 30 Cal.4th 226,

256.)  Our Supreme Court noted that by instructing the jury to " 'start from scratch,' " the court correctly implied the jury should disregard its previous deliberations and start anew. (*Ibid*.)  However, when the trial court added that the jury should start from scratch so the alternate juror could have the " 'benefit' " of " 'everything' " that had previously " 'gone on,' " it implied the jury should not disregard its previous deliberations.  (*Ibid*.)  Our Supreme Court determined that this interpretation of the trial court's comments would defeat the purpose of the instruction required under *Collins*.  (*Odle*, at p. 405; but see *Claudio*, *supra*, 68 F.3d at p. 1577 [approving trial court instruction for original jurors to "completely inform the replacement juror of all previous deliberations and of each juror's individual point of view" because instruction "designed to eliminate any disadvantage that the alternate juror may have felt as a result of her late introduction into the deliberations and to ensure her full, effective, and uncoerced participation in all aspects of the deliberations"].)  However, our Supreme Court ultimately "assumed error" occurred and found the error was not prejudicial.  (*Odle*, at pp. 405–406.)[43]

We note that the trial court's instruction in *Odle* was decidedly less comprehensive, allowed for confusion, and stated two contrary concepts with equal force. CALCRIM. No. 3575, however, clearly mandates the jurors to set aside prior deliberations and to deliberate anew.  The instruction, as given by the trial court in this case, states no less than four times that all deliberations must begin anew:  "this right will only be assured if you begin your deliberations again from the beginning," "you must set aside and disregard all past deliberations and begin your deliberations all over again,"

---

[43]    Subsequent to *Odle*, our Supreme Court found no error where "the trial judge advised the jury to resume its deliberations, stating it 'would be helpful and in connection with commencing your deliberations again, that you kind of start, start from scratch, so to speak, so that [the alternate juror] has the benefit of your thinking as well as give him an opportunity for his input also.' "  (*People v. Proctor* (1992) 4 Cal.4th 499, 536.)  The court held that this instruction comported with *Collins*, explaining in part:  "By instructing the jury to 'kind of start, start from scratch, so to speak,' the court implied that the jury should disregard its previous deliberations."  (*Proctor*, at p. 537.)

"[e]ach of you must disregard your earlier deliberations and decide this case as if those earlier deliberations had not taken place," and "please return to the jury room and start your deliberations from the beginning."

In *Guillen*, although the trial court instructed the jury in compliance with *Collins*, the court held these advisements were insufficient because, "like in *Odle*," the trial court implied that the jury should *not* disregard the prior deliberations by honoring the original jury's request. (*Guillen*, *supra*, 227 Cal.App.4th at p. 1030.) We disagree that the trial court's instruction in this case was like the instruction given in *Odle* in light of its unequivocal and repeated instruction to "start over," or that an implication arising from the trial court's action would be sufficient to override the trial court's explicit instructions. However, *Guillen* is distinguishable as well because the implication there arose because the original jury formally communicated a request to the trial court, and the trial court actually answered the original jury's question, instructed the jury to deliberate anew, and then sent the court reporter to them to read back testimony as originally requested without providing the new jury the option to determine if and when such readback was needed.

In this case, however, the trial court did not arrange for the court reporter to read back the testimony and did not provide answers to the original jury's questions. The trial court here instructed the reconstituted jury to communicate when it was ready for readback. The court never expressly contradicted its admonition to the jury to restart deliberations. We conclude that the effect of the trial court's comment was not sufficient to imply to the jury to disregard their obligation to start deliberations over. Had the reconstituted jury not sent another request, then the court reporter would not have read back any testimony. In essence, the trial court advised the reconstituted jury to decide

when and if it needed testimony to be read back and thereby permitted the jurors to determine for themselves whether any readback was necessary.**44**

In addition, if the trial court's instructions were susceptible of the interpretation defendant now asserts, counsel likely would have objected at trial on this basis. Such an omission suggests that " ' "the potential for [confusion] argued now was not apparent to one on the spot." ' (*People v. Keenan* (1988) 46 Cal.3d 478, 535 [failure to object to trial court's remarks about potential jury investigation suggested the potential for coercion was not discernible], quoting *Lowenfield v. Phelps* (1988) 484 U.S. 231, 240.)" (*People v. Young*, *supra*, 34 Cal.4th at p. 1203.)

"The better practice would have been for the trial court to inform the newly impaneled jury the original jury's requests were void, jury deliberations were to begin anew, and the court would consider all requests from the newly impaneled jury." (*Guillen*, *supra*, 227 Cal.App.4th at p. 1030.) However, given the trial court's reading of CALCRIM No. 3575 and its failure to honor the original jury's request, we do not believe a reasonable juror would rationally infer that the court intended to override its previous directives based on the trial court's comment.

### 2. Any Err in Instructing the Jury to Deliberate Anew Was Harmless

Assuming that the failure to adequately instruct the jury to commence deliberations anew after a juror substitution is violative of the Sixth Amendment as well as the California Constitution, we find any error to be harmless beyond a reasonable doubt. (See *Chapman*, *supra*, 386 U.S. at p. 24.)

In assessing whether any error in the instructions was harmless, we consider the strength of the evidence and compare the time deliberating before and after the alternate juror was substituted. (See *Collins*, *supra*, 17 Cal.3d at pp. 697, 691, 690 ["The case

---

**44**     When the jury communicated with the court, the request was different than what had been mentioned by the original jury; more than Mendoza's testimony was requested.

against defendant is very strong." "The error was thus harmless and nonprejudicial." (jury deliberated for approximately one hour and 15 minutes before substitution and "few hours" thereafter)]; *Griesel v. Dart Industries, Inc.* (1979) 23 Cal.3d 578, 585, 583 [finding prejudice where case was close and jury deliberated seven days before substitution and only four hours after]; *Odle*, *supra*, 45 Cal.3d at p. 405 ["we observed that the closeness of the case and the comparison of time spent deliberating before and after the substitution of the alternate juror"—part of an afternoon versus two and one-half days—"were factors to be considered when determining prejudice"]; *People v. Proctor*, *supra*, 4 Cal.4th at p. 537 [evidence was overwhelming and deliberation prior to substitution of juror was minimal (little more than one hour) compared to deliberations after substitution (several hours)].)

Federal cases have also considered whether the jury was prevented from starting deliberations over and if the time deliberating after substitution evidenced the alternate's participation in deliberations. (See *Peek*, *supra*, 784 F.2d at pp. 1482 & fn. 2, 1485 [finding no prejudice where not instructed to begin deliberations anew or equivalent and jury deliberated for two hours before substitution and 15–30 minutes thereafter]; *Claudio*, *supra*, 68 F.3d at pp. 1575, 1577 [jury not instructed to begin deliberations anew or equivalent and jury deliberated for six and one-half hours before substitution and nine and one-half hours thereafter]; *United States v. Virgen-Moreno* (5th Cir. 2001) 265 F.3d 276, 289 [jury not instructed to begin deliberations anew or equivalent but jury deliberated for 15 minutes before substitution and three hours thereafter]; *United States v. Oscar*, *supra*, 877 F.3d at p. 1289 [jury deliberated two and one-half days before substitution and nine hours after indicated alternate not coerced.)

Courts have also considered whether the jury, after substitution of the alternate, returned verdicts indicating discrimination and consideration of the charges. (See, e.g., *Hillard*, *supra*, 701 F.2d at pp. 1055–1057 [noting jury deliberated two days before the substitution and two days after, requested testimony and exhibits, and also returned

53.

separate verdicts (both guilty and not guilty) as to each defendant and charge during that time].)

In the instant case, the original jury deliberated for three hours before retiring for the day. One juror reported to the trial court that they estimated needing more than 20 minutes because the jury would be requesting readback of Mendoza's testimony, but they did not believe it would "take that much longer." However, after substitution of the alternate juror, the jury took longer than originally estimated, indicating the deliberations included more than the remaining counts. The reconstituted jury commenced deliberations at 9:07 a.m. After deliberating for an hour, the jury sent a note requesting readback of G.S.'s and M.C.'s testimonies in addition to Mendoza's testimony.[45] This was completed at 11:43 a.m., and the jury notified the court of its verdicts at 2:05 p.m. The record does not indicate the jury took any breaks and, excluding time with the court reporter, the jury deliberated no less than two and as much as three hours after the alternate juror joined the jury. While this may have been the same or shorter than original jury's deliberations, the difference is not vastly significant.

The actual, deliberative conduct of the reconstituted jury indicates the jury started deliberations anew. The original jury reviewed 10 or 11 of the counts relating to G.S. within the first three hours of deliberation and indicated it would not take much longer than 20 minutes to review of the remaining five or six counts. However, the jury deliberated longer than originally anticipated if it were only considering the remaining counts. In addition, after substitution of the alternate, the reconstituted jury requested more testimony than just Mendoza's as previously indicated, including M.C.'s and G.S.'s in their request even though the original jury reported having reviewed 11 of the 13 counts relating to G.S. These factors are also indicative that the jury did not continue its

---

[45]   Mendoza's provided expert testimony as to the DNA results which was pertinent to counts 12 and 13 (the sexual abuse that occurred just prior to G.S.'s report to the police).

prior deliberations but started their deliberations anew. We also consider the jury's decision not to return verdicts on the counts they had reviewed before the alternate was substituted and comment that the alternate juror would want to participate in the decisions as to those counts. These factors and the actual instructions by the trial court, which included an admonition to start deliberating over again at least four times, causes us to conclude that the jury did not disregard the court's admonitions.

We agree with the People that this was not a close case and the evidence was strong in support of the guilty verdicts. The information contained 16 counts of child abuse, including 13 counts involving G.S. G.S. testified that defendant committed the various acts against her. Her testimony was essentially unimpeached. As to counts 12 and 13, G.S. testified that the sexual assaults occurred just before they were reported to the police and this was corroborated by DNA evidence that was obtained from G.S. at that time. The DNA contained a sperm protein and, while defendant could not be eliminated as a contributor, the statistical evidence showed that the same DNA profile would be expected to occur randomly in only one in 91 quadrillion Hispanics (a virtual statistical certainty). This evidence corroborated G.S.'s testimony regarding the recent sexual assault given the unlikelihood it resulted from inadvertent contact.

G.S.'s mother, Estella, testified that just after the abuse was reported to the police, she spoke with defendant who refused to return home because he feared he would be arrested, which supported an inference that he was conscious of his guilt. In addition, the testimony of G.S., M.C., and I.C. corroborated that defendant sexually assaulted them. Defendant's only evidence was from Lola, a nurse who testified that she never saw anything unusual when she regularly visited defendant's residence during the several weeks preceding G.S.'s report of the abuse. However, Lola also testified that during the visits, she stayed just inside the residence by the front door and was only present for 5 to 10 minutes at a time. This testimony did not convincingly contradict G.S.'s testimony

55.

concerning defendant's early morning abuse of her during that time period or respond to G.S.'s testimony of the preceding years of abuse.

We conclude that, even if the Sixth Amendment required the trial court to instruct the reconstituted jury to deliberate anew, any error in doing so was harmless beyond a reasonable doubt.

## DISPOSITION

The conviction on count 5 is reversed. The conviction on count 12 is modified to assault of a person under 18 years of age with intent to commit rape in violation of Penal Code section 220, subdivision (a)(2). The case is remanded to the trial court with directions to reverse the conviction on count 5, modify the conviction on count 12, resentence defendant, and exercise its discretion under Penal Code section 654, as amended by Assembly Bill No. 518 (Stats. 2021, ch. 441, § 1), to stay the sentence on either count 8 or count 9. The judgment is affirmed in all other respects.

HILL, P. J.

WE CONCUR:


DETJEN, J.


SMITH, J.

56.